UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RACHEE A. WILLIS | ) | Civil No. 11cv01683 LAB(RBB) |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **DENYING DEFENDANTS' MOTION FOR** |
| v. | ) | **SUMMARY JUDGMENT [ECF NO. 34]** |
| | ) | |
| MCEWEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

        Plaintiff Rachee A. Willis, a state prisoner proceeding pro se
and in forma pauperis, filed a Complaint on July 25, 2011 [ECF Nos.
1, 3], and a First Amended Complaint nunc pro tunc to November 23,
2011 [ECF No. 5], pursuant to 42 U.S.C. § 1983.  Willis claims that
the Defendants violated his Eighth Amendment right to be free from
cruel and unusual punishment while he was incarcerated at
Calipatria State Prison ("Calipatria").  (First Am. Compl. 1, 3-4,
10-11, ECF No. 5.)[1]

_____

        [1]  The Court will cite to all documents using the page numbers
assigned by the electronic case filing system.

On May 21, 2012, Defendants Cerros, Navarro, Landeros, and the California Department of Corrections and Rehabilitation ("CDCR") filed a Motion to Dismiss, along with a Memorandum of Points and Authorities [ECF No. 15].  The Motion to Dismiss was granted as to the CDCR and denied as to the three individual Defendants on January 16, 2013.  (Report & Recommendation 21, ECF No. 20; Order Adopting Report & Recommendation 2, ECF No. 24.)  The remaining three Defendants filed an Answer on January 30, 2013 [ECF No. 25].

Defendants Cerros, Navarro, and Landeros filed a Motion for Summary Judgment on October 21, 2013, along with a Memorandum of Points and Authorities (the "Memorandum of Points and Authorities") and several attachments [ECF No. 34].  Plaintiff was given notice on October 23, 2013, of his opportunity to submit evidence in opposition to Defendants' Motion for Summary Judgment, pursuant to Rand v. Rowland, 154 F.3d 952 (9th Cir. 1988) (en banc), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988) [ECF No. 35]. Willis filed a Response to Defendants' Motion for Summary Judgment (the "Response") on November 26, 2013 [ECF No. 38].  Defendants did not file a reply.

The Court has reviewed the First Amended Complaint and attachments, the Motion for Summary Judgment, and Plaintiff's Response.  The Motion for Summary Judgment is suitable for resolution on the papers.  See S.D. Cal. Civ. R. 7.1(d)(1).  For the reasons discussed below, the Motion for Summary Judgment [ECF No. 34] should be **DENIED**.

## I.   FACTUAL BACKGROUND[2]

Willis pleads that on October 19, 2010, officials initiated an "emergency recall" from the recreation yard due to poor visibility caused by rain.  (First Am. Compl. 8, ECF No. 5.)  Two officers who are not Defendants were patting down inmates outside of building A-1, and Defendants Landeros and Cerros were conducting boot checks at the "podium."  (Id.)  Plaintiff maintains that while waiting for his boot check, a prisoner in "upper C-section" called his name. (Id.)  When he looked to see who it was, he noticed only Black inmates were being placed back in their cells -- except the building porter -- whereas Hispanic inmates were allowed to stand in front of their cells, unsecured.  (Id.)  According to Willis, this was "extremely unusual" because the "normal procedure" is for officers to cell inmates one building section at a time, as opposed to one race at a time.  (Id.)  "[I]n my 5 years at this prison I've never seen [this] before and because it is common knowledge that such circumstances are ideal for riots where in a single race of inmates have the tactical advantage of numbers over another or the unified co-oporation [sic] to commit to mass disturbances against correctional staff."  (Id.)  Defendant Navarro was purportedly in the "A-1 control tower," and he decided to cell only Black inmates. (Id. at 2.)

Plaintiff urges that as soon as he stepped in front of the "staff office door," Defendants Cerros and Landeros ran out of the building to assist with a riot in the recreation yard; a large

---

[2]  Plaintiff's First Amended Complaint is not verified because it was not signed "under the pains and penalties of perjury."  (See First Am. Compl. 11, ECF No. 5); Schroeder v. McDonald, 55 F.3d 454, 460 n.10 (9th Cir. 1995).  The Court cites to the First Amended Complaint as background, not as evidence.

group of prisoners ran out with the Defendants to attempt to participate in the riot. (_Id._ at 8-9.)  Defendant Navarro closed the building door after realizing that inmates were running out to join in the riot.  (_Id._)  One of the Hispanic inmates had yelled something in Spanish, and a large group ran toward the metal detector where two Black inmates were putting on their boots.  (_See id._)

Willis alleges that when he realized the Hispanic inmates were attacking the Black prisoners, three Hispanic inmates ran toward him and "everything went black for a moment."  (_Id._ at 9.) Plaintiff was purportedly attacked by approximately forty Hispanic prisoners with weapons for ten minutes; he was hit with the "base of a large telephone" and a "large stick."  (_See id._)  At some point during the riot, Willis lost consciousness and was found lying in a pool of his blood while medical personnel assisted him. (_See id._)  He told the medical staff that his head, face, and left lung hurt.  (_Id._)  Plaintiff was taken to a medical facility and given a tetanus shot and antibiotics; he was also informed that the puncture wound to his face "would probably need stitches."  (_Id._)

Defendants Landeros and Cerros allegedly failed to secure the building's equipment locker and center podium before the "first or second voluntary inlines" from the recreation yard.  (_Id._) Plaintiff states that prison procedures require officers to secure these areas to prevent inmates from using a "mop and broom sticks and shaving razor blades" as weapons.  (_Id._)  Willis further submits that after the incident and while prisoners were being interviewed, Defendant Landeros apologized to the Black inmates saying, "'I'm so sorry, I had no idea [the Hispanic prisoners were]

1  going for you guys, we thought they were going to fight each

2  other.'"  (Id.)  According to Plaintiff, this shows that Landeros

3  and other officers knew that a "mass altercation" was about to

4  transpire.  (Id.)  Willis insists that it was later discovered

5  "that the tower officer in building A-3" only let Black inmates

6  into their cells but left Hispanic prisoners unsecured in the

7  building.  (Id. at 10.)

8      Plaintiff argues that Defendants Landeros, Cerros, and Navarro

9  violated his Eighth Amendment rights by failing to protect him.

10  (Id.)  Landeros and Cerros knowingly neglected to secure the

11  equipment locker and razor cabinet.  (Id.)  Also, Navarro

12  intentionally permitted only Black prisoners to enter their cells,

13  contrary to prison procedures.  (Id.)  Willis maintains that

14  Defendants left him in a building with forty to fifty unrestrained

15  Hispanic prisoners outside of their cells, although the Defendants

16  anticipated a riot.  (Id.)

17            **II.  LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS**

18      Federal Rule of Civil Procedure 56(a) provides, "The court

19  shall grant summary judgment if the movant shows that there is no

20  genuine dispute as to any material fact and the movant is entitled

21  to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Like the

22  standard for a directed verdict, judgment must be entered for the

23  moving party "if, under the governing law, there can be but one

24  reasonable conclusion as to the verdict."  Anderson v. Liberty

25  Lobby, Inc., 477 U.S. 242, 250 (1986) (citing Brady v. S. Ry. Co.,

26  320 U.S. 476, 479-80 (1943)).  "If reasonable minds could differ,"

27  judgment should not be entered in favor of the moving party.  Id.

28

at 250-51; see Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007).

The parties bear the same substantive burden of proof that would apply at a trial on the merits, including the plaintiff's burden to establish any element essential to his case. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson, 477 U.S. at 252; see Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (alteration in original) (quoting Celotex Corp., 477 U.S. at 322). The absence of a genuine issue of material fact on a single element of a claim is sufficient to warrant summary judgment on that claim. Celotex Corp., 477 U.S. at 322-23.

The moving party bears the initial burden of identifying the pleadings and evidence it "believes demonstrate the absence of a genuine issue of material fact." Id. at 323; see Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003). The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. Celotex Corp., 477 U.S. at 324. To successfully rebut a defendant's properly supported motion for summary judgment, the "plaintiff[] must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[']s[] favor, could convince a reasonable jury to find for the plaintiff[]." Reese v.

6

1  <u>Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir. 2000)

2  (citing Fed. R. Civ. P. 56; <u>Celotex Corp.</u>, 477 U.S. at 323;

3  <u>Anderson</u>, 477 U.S. at 249).  Material issues are those that "might

4  affect the outcome of the suit under the governing law." <u>Anderson</u>,

5  477 U.S. at 248; <u>see</u> <u>Chevron USA, Inc. v. Cayetano</u>, 224 F.3d 1030,

6  1039-40 (9th Cir. 2000); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301,

7  1305-06 (9th Cir. 1982).  More than a "metaphysical doubt" is

8  required to establish a genuine issue of material fact.  <u>Matsushita</u>

9  <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

10      In deciding whether any genuine issue of material fact remains

11  for trial, courts must "view[] the evidence in the light most

12  favorable to the nonmoving party . . . ." <u>Fontana v. Haskin</u>, 262

13  F.3d 871, 876 (9th Cir. 2001); <u>see also</u> <u>Eastman Kodak Co. v. Image</u>

14  <u>Technical Serv., Inc.</u>, 504 U.S. 451, 456 (1992) (stating that the

15  nonmoving party's evidence is to be believed and all reasonable

16  inferences drawn in the nonmoving party's favor).  "When opposing

17  parties tell two different stories, one of which is blatantly

18  contradicted by the record, so that no reasonable jury could

19  believe it, a court should not adopt that version of the facts for

20  purposes of ruling on a motion for summary judgment." <u>Scott v.</u>

21  <u>Harris</u>, 550 U.S. 372, 380 (2007).  While the district court is not

22  required to search the entire record for an issue of fact, the

23  court may nevertheless exercise its discretion to consider

24  materials in the record that are not specifically referenced.

25  <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031

26  (9th Cir. 2001); <u>Forsberg v. Pacific N.W. Bell Tel. Co.</u>, 840 F.2d

27  1409, 1417-18 (9th Cir. 1988).

28

1    When the nonmoving party is proceeding pro se, the court has a
2    duty to consider "all of [the nonmovant's] contentions offered in
3    motions and pleadings, where such contentions are based on personal
4    knowledge and set forth facts that would be admissible in evidence,
5    and where [the nonmovant] attested under penalty of perjury that
6    the contents of the motions or pleadings are true and correct."
7    Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004) (citations
8    omitted).

9                          **III.   DISCUSSION**
10   **A.    Eighth Amendment:  Failure to Protect**

11         "[T]he treatment a prisoner receives in prison and the
12   conditions under which he is confined are subject to scrutiny under
13   the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31
14   (1993).  The Eighth Amendment "requires that inmates be furnished
15   with the basic human needs, one of which is 'reasonable safety.'"
16   Id. at 33 (quoting Deshaney v. Winnebago County Dep't of Soc.
17   Servs., 489 U.S. 189, 200 (1989)).  Therefore, a plaintiff has a
18   right to be protected from violence while in custody.  Farmer v.
19   Brennan, 511 U.S. 825, 833 (1994); Johnson v. Lewis, 217 F.3d 726,
20   731 (9th Cir. 2000); Valandingham v. Bojorquez, 866 F.2d 1135, 1138
21   (9th Cir. 1989).  "Prison officials have a duty to take reasonable
22   steps to protect inmates from physical abuse." Hoptowit v. Ray,
23   682 F.2d 1237, 1250 (9th Cir. 1982) (citations omitted), abrogated
24   in part on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).
25   When the state takes a person into custody, the Constitution
26   imposes a duty to assume some responsibility for his safety and
27   well-being.  Deshaney, 489 U.S. at 1005.
28

11cv01683 LAB(RBB)

To constitute an Eighth Amendment violation, a plaintiff must show that the defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner's safety.  Farmer, 511 U.S. at 834; see Jeffers v. Gomez, 267 F.3d 895, 913 (9th Cir. 2001) ("A prison official is deliberately indifferent to a substantial risk of serious harm to inmates if that official is subjectively aware of the risk and does nothing to prevent the resulting harm.").  The prison official is only liable when two requirements are met; one is objective, and the other is subjective.  Farmer, 511 U.S. at 834, 838; see Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009).  First, the purported violation must be objectively "sufficiently serious."  Farmer, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the prison official must subjectively "know[] of and disregard[] an excessive risk to inmate health or safety."  Id. at 837.

1.   Defendants Landeros and Cerros

a.   Objective requirement:  sufficiently serious deprivation

To establish an Eighth Amendment claim, the alleged deprivation must be "objectively, 'sufficiently serious.'"  Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 298).  In cases alleging prison authorities' failure to prevent harm, the inmate may satisfy the "sufficiently serious" requirement by showing that "he is incarcerated under conditions posing a substantial risk of serious harm" to him.  Id.  Courts must consider the seriousness of the potential harm and whether society deems the risk to be so grave that it violates standards of decency.  Helling, 509 U.S. at 36; see Hudson v. McMillian, 503 U.S. 1, 8 (1992).

9

Defendants Landeros and Cerros contend that they followed prison protocol by allowing the inmate porter to keep the equipment locker open during the voluntary in-lines while he was cleaning. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 15, ECF No. 34; id. Attach. #4 Decl. Landeros at 2.)  Further, they maintain that they were unable to close the equipment locker due to "(1) the emergency recall which occurred immediately after a voluntarily in-line; (2) the wet weather, causing inmates to group in the entry way to the housing unit; and (3) a race riot on the yard immediately following the emergency recall." (Id. Attach. #1 Mem. P. & A. at 15.)  The Defendants argue that they acted reasonably under the circumstances; at most, they claim they were negligent.  (Id. at 15-16 (citations omitted).)

In the Response, Willis urges that Cerros and Landeros "facilitated the riot thereby creating circumstances that ended in [him] being attacked by about 40 Hispanic inmates with weapons, making them liable under the Eighth Amendment." (Resp. 2, ECF No. 38.)  He responds to Defendants arguments by insisting that they could have secured the locker in the fifteen minutes between the time the voluntary in-line began and the emergency recall was announced. (Id. at 7 (citing id. at 15; Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 3, ECF No. 34).)  Further, he argues that they could have closed the locker in the eight minutes between the announcement of the emergency recall and beginning of the race riot. (Id. (citing Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 3, ECF No. 34).)  The equipment locker is secured during mass movements, Plaintiff contends, and the inmate porter is not responsible for locking it. (Id.)  Similarly, "[p]rotocol does not

mandate that the porter be allowed to leave the locker open or that it is his decision to have it open or closed." (Id.)

Next, Willis maintains that no inmates were grouped in the entry way of the housing unit. (Id. (citing id. at 15).)  To the extent there was any grouping, Plaintiff claims that it was due to Officer Navarro prohibiting Hispanic inmates from entering their cells during the voluntary in-lines. (Id. (citing id. at 16).) Moreover, "[t]he Defendants could've easily ordered inmates to go back out if they [felt] that inmates were crowding up the entry way and 'preventing' them from tending to the safety and security requirements they are to fulfill." (Id.)

In their Answer, Landeros and Cerros deny that the equipment locker and podium were left unsecured prior to the riot. (Compare First Am. Compl. 9, ECF No. 5 (stating that the locker and podium were left open prior to the voluntary in-lines), with Defs.' Answer First Am. Compl. 2, ECF No. 25) (denying allegations in paragraph eight of First Amended Complaint).  It is also disputed that items from the locker and podium were used as weapons against Willis. (Compare First Am. Compl. 9, ECF No. 5 (claiming that a large stick and phone base were used to beat Plaintiff), Resp. 13, ECF No. 38 (same), with Defs.' Answer First Am. Compl. 2, ECF No. 25) (denying allegations in paragraph eight of First Amended Complaint).

Defendants do not dispute that the equipment locker, which housed brooms and mops, remained unlocked during the voluntary recall at 10:15 a.m., emergency recall at 10:30 a.m., and at 10:38 a.m., when a "Code 2 riot on the yard" was declared. (Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 3, ECF No. 34; id. Attach. #5 Decl. Cerros at 2.)  Both officers state that the podium, however,

1   "had been locked and remained locked."  (Id.)  According to

2   Landeros, "No metal objects are kept in the equipment locker to

3   prevent the inmates from stealing them and fashioning weapons."

4   (Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 2, ECF No. 34.)

5   Finally, both Defendants admit that "[o]n October 19, 2010, [each]

6   was assigned as a floor officer on Facility A, Housing Unit A-1, at

7   Calipatria State Prison."  (Defs.' Mot. Summ. J. Attach. #4 Decl.

8   Landeros 2, ECF No. 34; id. Attach. #5 Decl. Cerros at 2.)

9        In their Motion for Summary Judgment, Defendants' arguments

10  focus almost entirely on their conduct after the emergency recall.

11  (See id. Attach. #1 Mem. P. & A. at 15-16.)  Yet, Plaintiff's claim

12  is that Landeros and Cerros failed to secure the equipment locker

13  and podium before the voluntary in-lines.  (See First Am. Compl. 9,

14  ECF No. 5 ("Landeros and Cerros did not secure the building's

15  equipment locker or the center podium before first or second

16  voluntary inlines from [the] recreational yard . . . ."); see also

17  Resp. 7, ECF No. 38 (arguing that the correctional officers also

18  could have secured the items (1) after the voluntary in-lines began

19  but before the recall and (2) after the recall but before the

20  riot).)[3]

21  _____

22      [3]  Defendants briefly address the relevant time period by
    stating that the equipment locker is typically left open while the
23  inmate porter cleans.  (Defs.' Mot. Summ. J. Attach. #1 Mem. P. &
    A. 15, ECF No. 34; id. Attach. #4 Decl. Landeros at 2.)  Because
24  this assertion is relevant to the reasonable justification inquiry,
    the Court will address it in its subsequent analysis of that issue.

25      It is a bit unclear in the Complaint if, in addition to their
26  failure to secure the podium and locker prior to the voluntary in-
    lines, the Plaintiff also faults Defendants Cerros and Landeros for
27  leaving the housing unit floor to respond to the riot outside.
    (Compare First Am. Compl. 2, 8, ECF No. 5 (stating that Defendants
28  ran out of the building), with id. Ex. A Decl. Willis at 14 ("N.E.
    Landeros and Cerros were forced to ignore and advertently neglect
    the obvious dangerous zone/circumstances by leaving the building

Ultimately, "[t]he objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." Lemire v. Cal. Dep't of Corr. and Rehab., 726 F.3d 1062, 1075-76 (9th Cir. 2013) (citing Conn v. Reno, 591 F.3d 1081, 1095 (9th Cir. 2010)).  A reasonable juror could determine that these Defendants created a substantial risk of serious harm when they failed to secure the equipment locker (which contained brooms and mops that could be used as potential weapons) prior to the riot.

Courts recognize that "virtually anything can be employed as a weapon," including "pool cues, brooms, and chairs." See Clay v. Wilkinson, No. 07-CV-0730, 2007 U.S. Dist. LEXIS 102032, at *10 (W.D. La. Dec. 10, 2007).  An open equipment locker would allow inmates to use its contents as weapons to injure Willis and others. If one inmate is armed and another is not, a substantial risk of harm exists.  If multiple inmates are armed, the risk remains.

The court in Brittain v. Clemons, Civil Action No. 4:09CV-P123-M, 2011 WL 2471587, at *8 (W.D. Ky. June 21, 2011) discussed the objective prong of an Eighth Amendment claim alleging that a prison official failed to timely respond to an altercation between inmates.

> If two inmates are armed with weapons and engaged in combat with one another, there is an objective risk that serious harm will come to one or both of them if prison officials do not intervene.  Accordingly, for the

unsecured to follow the common practices of alarm response.").)  In his Response, Willis clarifies that he does not fault Defendants for leaving the building to quell the riot.  (See Resp. 8, ECF No. 38 ("I agree that the Defendants had no choice but to respond to the Code 3 race riot call, but they had ample opportunity to secure the locker before that time.").)

purposes of summary judgment, Plaintiff satisfies the first prong necessary to prevail on a failure-to-protect claim.

As to the objective question of whether Landeros's and Cerros's failure to secure the equipment locker during an emergency recall or Code 2 riot exposed Willis to a substantial risk of serious harm, the Defendants have failed to prove that summary judgment should be entered in their favor.

### b.   Subjective requirement:  deliberate indifference

After an inmate has shown a triable issue as to whether he suffered a deprivation that was objectively, "sufficiently serious," he must also establish a triable issue regarding whether the prison officials had a "sufficiently culpable state of mind," acting with deliberate indifference.  Farmer, 511 U.S. at 834; see Thomas v. Ponder, 611 F.3d 1144, 1151 (9th Cir. 2010). "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  Farmer, 511 U.S. at 835.  Liability materializes if the defendant knew the inmate faced a risk of harm and disregarded that risk by failing to take reasonable measures to abate it.  Id. at 847.  Therefore, demonstrating subjective deliberate indifference involves a two-part inquiry:  (1) whether the defendant was subjectively aware of a risk of serious harm to the prisoner's safety, and (2) whether the official had a ''reasonable justification' for the deprivation."  Thomas, 611 F.3d at 1150-51; see Sistrunk v. Hall, No. 3:09-cv-01122-BR, 2012 WL 1357659, at *6 (D. Or. Apr. 19, 2012) (citation omitted) (internal quotation marks omitted) ("Deliberate indifference is evaluated in

14

this context by considering whether . . . the defendant prison official(s) were guided by considerations of safety to other inmates, whether the official(s) took prophylactic or preventive measures to protect the prisoner, and whether less dangerous alternatives were in fact available.").

"First, the inmate must show that the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety." Id. (footnote omitted) (citing Farmer, 511 U.S. at 837). This may be satisfied if the prisoner establishes that the risk posed by the violation was "obvious." Id. (citations omitted). A plaintiff need not show that an "individual prison official had specific knowledge that harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome." Id. "Rather, [courts] measure what is 'obvious' in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." Id. at 1151 (citing Farmer, 511 U.S. at 842). For example, if a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and the defendant "had been exposed to information concerning the risk and thus must have known about it," a trier of fact could find defendant had actual knowledge of the risk. Farmer, 511 U.S. at 842 (citations omitted) (internal quotations omitted); see Thomas, 611 F.3d at 1151. Whether a defendant had the requisite knowledge is a question of fact subject to substantiation in the usual ways, including inferences drawn from circumstantial evidence. Farmer, 511 U.S. at 842.

"The standard does not require that the guard or official
'"believe to a moral certainty that one inmate intends to attack
another at a given place at a time certain before that officer is
obligated to take steps to prevent such an assault.  But, on the
other hand, he must have more than a mere suspicion that an attack
will occur."'"  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir.
1986) (quoting State Bank of St. Charles v. Camic, 712 F.2d 1140,
1146 (7th Cir. 1983)).

"Second, the inmate must show that the prison officials had no
'reasonable' justification for the deprivation, in spite of that
risk."  Thomas, 611 F.3d at 1150-51 (citing Farmer, 511 U.S. at
844).  "[P]rison officials who actually knew of a substantial risk
to inmate health or safety may be found free from liability if they
responded reasonably to the risk, even if the harm ultimately was
not averted."  Farmer, 511 U.S. at 844.

Here, Plaintiff maintains that Landeros told him, "I'm so
sorry.  I had no idea they [were] going for you guys, we thought
they were going to fight each other."  (First Am. Compl. 9, ECF No.
5; Resp. 14, ECF No. 38.)  In her declaration, Landeros denies
making the statement.  (See Defs.' Mot. Summ. J. Attach. #4 Decl.
Landeros 4, ECF No. 34.)  Cerros and Landeros contend that even if
she did make the assertion, it "in no way indicate[s] she knew
about the riot prior to its occurrence."  (Id. Attach. #1 Mem. P. &
A. at 16.)  "[T]he most logical reading of the alleged comments are
[sic] that Landeros believed when she was out in the yard
responding to the Code 3 that the Hispanic inmates were fighting
each other."  (Id.)

Defendants insist they did not know that a riot might occur. (Id. (citing id. Attach. #4 Decl. Landeros at 4; id. Attach. #5 Decl. Cerros at 3).)  Specifically, Landeros claims that she "had no idea it was a race riot until after she returned to the housing unit and saw that Plaintiff had been in an altercation."  (Id.) For these reasons, Cerros and Landeros request that summary judgment be entered in their favor as to the subjective prong. (Id. at 17.)

In the Response, Willis challenges Officer Landeros's assertion that she did not know that the riot was racially motivated until after it was over.  (Resp. 8, ECF No. 38.) Plaintiff relies on Navarro's declaration that an announcement was made that a "Code 3 racial riot" was occurring.  (Id. (citing Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 3, ECF No. 34).) Thus, "Landeros could not have ran to the yard expecting to see inmates of the same race fighting . . . ."  (Id.)  Willis stresses that Landeros said that the correctional officers thought the Hispanics "'were going to fight'" each other.  (Id.)  He contends that if Defendant Landeros meant to articulate that she had just witnessed the Hispanics fighting, she would have said something like, "'We thought they were fighting each other . . . .'"  (Id.) Further, he insists that Officer Landeros would have nothing to apologize for if her conduct was appropriate and the events that transpired were truly unexpected.  (Id.)

### i.  Actual knowledge

Plaintiff relies solely on Landeros's statement to prove that the officers knew there was a strong likelihood that a riot would occur.  As a preliminary matter, the Court notes that the

Defendants do not make any evidentiary objections in their Motion for Summary Judgment. (See generally Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 13-21, ECF No. 34.) Willis declares under penalty of perjury that Landeros made the statement; Landeros swears under penalty of perjury that she did not. (Compare Resp. 14-15, ECF No. 38, with Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 4-5, ECF No. 34.) The Court does not weigh evidence or make credibility determinations at this stage. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. After considering the conflicting evidence, a reasonable juror could find Plaintiff's evidence more credible. See Kramer v. Thomas, No. CV 05-8381 AG (Ctx), 2006 WL 4729242, at *9 (C.D. Cal. Sept. 28, 2006) (denying motion for summary judgment because the parties introduced contradictory evidence about whether certain material statements were made).[4]

Even assuming Landeros made the statement, the parties dispute its meaning. (Compare Resp. 8, ECF No. 38 (explaining how the statement should be interpreted), with Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 16, ECF No. 34 ("[T]he most logical reading of the alleged comments are [sic] that Landeros believed when she was out in the yard responding to the Code 3 that the Hispanic inmates were fighting each other.").) "[T]hat a statement admits of more than

---

[4] Adding to the factual dispute, Defendants note that Plaintiff stated at his deposition that "none of the correctional officers knew about the riot prior to it commencing." (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 11, ECF No. 34 (citing id. Attach. #3 Decl. Findley at 24).) Defendants only mention this in passing, however, and other than generally referencing it in the introduction of the Motion for Summary Judgment, they do not allude to it again. (See generally id. at 15-20.) In his Response, Willis claims that Defendants take his answer out of context. (Resp. 5-6, ECF No. 38.) He alleges that the question was posed to inquire whether, outside of Landeros's statement, Plaintiff knew "with certainty" whether the correctional officers anticipated a mass altercation. (Id. at 6.)

11cv01683 LAB(RBB)

one interpretation in itself suggests that there is a genuine issue of material fact as to its meaning." Lucas v. Paige, 435 F. Supp. 2d 165, 171 (D.D.C. 2006); see Goodell v. Chhon, No. S-01-0484 FCD DAD, 2002 WL 32943053, at *3 (E.D. Cal. June 11, 2002) ("A reasonable juror could interpret this statement in many different ways, and on that basis alone, the court could find that the testimony presents a triable issue of fact for the jury and is sufficient to withstand summary judgment."). A factfinder could reasonably determine that the statement proves that Officer Landeros was subjectively aware of a risk of serious harm to inmate safety. Accordingly, issues of material fact exist that preclude entry of summary judgment in Landeros's favor.

As to Defendant Cerros, Plaintiff maintains that Landeros used the term "we," indicating that she and other officers knew of the possibility of a riot. (Resp. 8, ECF No. 38 ("'We thought' includes Landeros as well as others . . . ."); First Am. Compl. 9, ECF No. 5 (imputing Landeros's knowledge that a mass altercation was going to occur to the other correctional officers).) Cerros denies under penalty of perjury that he knew an altercation was likely to occur. (Defs.' Mot. Summ. J. Attach. #5 Decl. Cerros 3, ECF No. 34.) Here, a jury could reasonably credit Willis's evidence and reject Cerros's evidence. Accordingly, a genuine issue of material fact exists that also precludes entry of summary judgment in favor of Officer Cerros. See Page v. Hense, No. 1:10-cv-01186-AWI-SKO PC, 2013 WL 3936513, at *6 (E.D. Cal. July 30, 2013) (finding an issue of fact where defendant denied having knowledge of a chrono and plaintiff provided evidence showing that defendant did have knowledge of the chrono).

### ii. No reasonable justification

Next, the Court must consider whether the officers' conduct was reasonably justified. See Thomas, 611 F.3d at 1150-51. These Defendants focus largely on their actions after the riot began, which, as discussed above, is not responsive to Plaintiff's claim. They briefly address their pre-riot conduct by stating that they "followed protocol when they allowed the inmate porter to leave the equipment locker open." (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 15, ECF No. 34; see also id. Attach. #4 Decl. Landeros at 2 ("The locker is left open during a voluntary in-line, because the porter is still cleaning at that point.").) As noted, Willis argues that prison protocol does not require the inmate porter to leave the locker open. (Resp. 7, ECF No. 38.) It is the correctional officers, not the inmate porters, who are responsible for securing the locker. (Id.)

Whether a correctional officer's conduct is reasonably justified is typically a fact intensive inquiry and not appropriate for resolution at the summary judgment stage. See Lemire v. Cal. Dep't of Corr. and Rehab., 726 F.3d at 1078. Other than the vague references above, these Defendants do not elaborate on the alleged protocol. Further, it appears that it was within their discretion to decide whether to secure the locker. (See Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 15, ECF No. 34 (stating that they followed protocol by "allowing" the inmate porter to leave the locker open).) A factfinder could reasonably determine that Landeros and Cerros were not reasonably justified in leaving the equipment locker and podium open so the inmate porter could clean, in light of the fact that they contained potential weapons that could be

used in a looming riot.  See Lemire, 726 F.3d at 1080 (noting that
triable issue of fact had been created regarding whether defendants
were reasonably justified).  For these reasons, Landeros and
Cerros's Motion for Summary Judgment as to Plaintiff's Eighth
Amendment claim should be **DENIED**.

    **2.   Defendant Navarro**

        **a.   Objective requirement:  sufficiently serious**
            **deprivation**

    In the Motion for Summary Judgment, Officer Navarro argues
that his decision not to admit inmates by section during the
voluntary in-lines does not amount to deliberate indifference.
(Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 17, ECF No. 34.)  The
Defendant contends that inmates are normally not admitted into
their cells by section, as it is neither safe nor feasible.  (Id.
(citing id. Attach. #6 Decl. Navarro at 2).)  "To require the
inmates to wait while other sections are admitted, would allow
inmates to congregate on the housing unit floor, which is dangerous
because it may lead to altercations between the inmates waiting to
be let into their cells." (Id. (citing id. Attach. #6 Decl.
Navarro at 2).)  Further, according to Navarro, opening an entire
section of cell doors at one time could lead to an increase in
theft.  (Id. (citing id. Attach. #6 Decl. Navarro at 2).)

    Defendant Navarro does not explain the manner in which he
allowed the inmates into their cells on October 19, 2010, the day
of the riot.  (See generally id. Attach. #6 Decl. Navarro at 1-5.)
He submits that typically inmates are allowed to return to their
cells in the order they are processed through the metal detector.
(Id. at 2.)  Navarro concedes that admitting inmates to their cells

in that order occasionally leads to racial imbalances. (Id. Attach. #1 Mem. P. & A. at 17 (citing id. Attach. #6 Decl. Navarro at 2).) "Inmates self-segregate by race . . . . As a result, inmates of one race are often let into their cells before inmates of another race." (Id.) Defendant asserts that this method is safer than allowing a large group of inmates to congregate on the housing unit floor. (Id. at 18 (citing id. Attach. #6 Decl. Navarro at 2).) He maintains:

> It was only the combination of (1) an emergency recall shortly after a voluntary recall; (2) wet weather that caused the inmates to enter the housing unit more quickly than normal; and (3) a race-riot on the yard immediately after the emergency recall, that led to a large group of Hispanic inmates on the housing unit floor during the race riot.

(Id.) Officer Navarro insists that he acted appropriately after the riot started by ordering inmates to stop fighting, activating his personal alarm, and firing direct-impact rounds. (Id.) Finally, he asserts that he did not know a riot might occur and could not have prevented it. (Id. (citations omitted).)

In the Response, Willis contends that despite Navarro's assertions, correctional officers normally admit inmates into their cells by section. (Resp. 9, ECF No. 38.) According to Plaintiff, the Defendant did not admit inmates into their cells as they passed through the metal detector on the day of the riot. (Id.) Rather, Willis submits that the officer allowed only "Black inmates into their cells even though there were several dozen of Hispanic inmates who were actually processed through the metal detector and were waiting in front of their cells but simply weren't let in." (Id. (citing id. at 13, 16).) Willis claims that Defendant's actions "created a risk of serious harm." (Id.)

As noted, whether a prison official exposed an inmate "to a substantial risk of serious harm is a question of fact." Lemire, 726 F.3d at 1075-76.  Plaintiff states under penalty of perjury that he witnessed Officer Navarro only letting Black inmates into their cells on October 19, 2010.  (Resp. 13, 15, ECF No. 38.) Defendant does not expressly refute Willis's version of the facts; he does not explain the manner in which he allowed inmates into their cells on the day of the riot.  (See Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 1-4, ECF No. 34.)  Assuming the facts are as Plaintiff presents them, a reasonable trier of fact could determine that Officer Navarro created an objective risk of serious harm by allowing only Black inmates into their cells, creating a racial imbalance that could lead to an altercation.  Cf. Woods v. Fermaint, No. 10 C 3853, 2012 WL 3581177, at *3 (N.D. Ill. Aug. 17, 2012) ("The Court finds there was a substantial risk in leaving unsupervised a gang member who has requested transfer because a disproportionate number of opposing gang members have recently specifically threatened to beat members of his gang.").

**b.  Subjective requirement:  deliberate indifference**

"The Ninth Circuit has traditionally required some sort of notice (constructive or otherwise) of impending harm before liability could be imposed under the Eighth Amendment for failure to protect an inmate." Pickett v. Williams, Civil No. 09-689-TC, 2011 WL 4913573, at *3 (D. Or. Aug. 23, 2011) (citations omitted). Here, Willis alleges that Defendant Navarro had knowledge of two risks to inmate safety:  (1) the obvious risk due to the racially imbalanced lockup and (2) the risk to inmate safety in light of a possible race riot (as evidenced by Landeros's statement), which

23

Navarro exacerbated by creating the racial imbalance.  (See First Am. Compl. 8, 9, ECF No. 5; Resp. 8, 11, 15, ECF No. 38.)

### i.  Sufficiently obvious risk

Navarro alleges that he "had no suspicion or information that the riot would occur." (Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 4, ECF No. 34.)  Plaintiff maintains that the threat to inmate safety should have been obvious to Navarro due to the dangerous manner in which he allowed inmates back into their cells. (See First Am. Compl. 8, ECF No. 5 ("[I]t is common knowledge that such circumstances are ideal for riots where[]in a single race of inmates have the tactical advantage of number over another . . . ."); Resp. 15, ECF No. 38 ("It i[s] common Knowledge among correctional officers that a drastic racial imbalance results in racial tension and/or riots because they are ideal circumstances for one racial group to severely harm the other.").)

"In order to prove that an official is subjectively aware of a risk to inmate health or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge; a plaintiff can rely on circumstantial evidence indicating that the official must have known about the risk." Robertson v. Newland, No. CIVS031712MCEKJMP, 2006 WL 509773, at *6 (E.D. Cal. Mar. 2, 2006) (citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)); see Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer v. Brennan, 511

24

U.S. at 842 (internal citation omitted); see Lemire, 726 F.3d at
1078; Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1190 (9th
Cir. 2002) ("In this case, a plethora of circumstantial evidence
could lead a reasonable jury to infer that the County was aware of
the risk that its policies presented."). Courts "measure what is
'obvious' in light of reason and the basic general knowledge that a
prison official may be presumed to have obtained regarding the type
of deprivation involved." Thomas v. Ponder, 611 F.3d at 1151
(citing Farmer, 511 U.S. at 842).

Here, the parties dispute whether the risk of harm due to the
racial imbalance was obvious. (Compare Defs.' Mot. Summ. J.
Attach. #6 Decl. Navarro 4, ECF No. 34, with Resp. 15, ECF No. 38.)
A jury could find that Navarro created an obvious risk of harm by
returning Black inmates to their cells at a pace that resulted in a
small number of Black inmates being out of their cells among forty
to fifty Hispanic inmates. See Thomas, 611 F.3d at 1150. Racial
imbalances on prison yards have led to conflicts in the past. In
Robertson v. Newland, 2006 WL 509773, at *5, "Plaintiff protested
that it was not safe for any African-American, because . . . 'you
cannot put 30 of nothing [sic] on a yard with five of anything else
. . . . [M]y concern was the numbers.'" There, the court denied
the defendants' motion for summary judgment and concluded that "an
issue of fact remains as to whether the risk of harm to
non-Hispanics on the yard was obvious, particularly in light of
unequal numbers on controlled compatible yard 3." Id. at *8.
Similarly, disputed issues of fact do not warrant the entry of
summary judgment in favor of Defendant Navarro.

### ii. Actual knowledge

In his declaration, Navarro states under penalty of perjury that he "did not have prior notice that the riot on October 19, 2010 would occur." (Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 4, ECF No. 34.)  Plaintiff relies on Landeros's statement to prove that Defendant Navarro knew that a mass altercation might take place. (See First Am. Compl. 9, ECF No. 5 (arguing that Landeros's statement shows that "other correctional officers were well aware" that a riot was going to occur); Resp. 8, ECF No. 38 ("Again, Landeros['s] statement shows the Defendants knew of a pending attack involving the Hispanic inmates."); id. at 11 (arguing that Navarro expected a riot).)  As discussed, to the extent Officer Landeros's statement can be interpreted to mean that other officers knew of a possible race riot, this is an issue of fact not proper for summary adjudication.  See Page v. Hense, 2013 WL 3936513, at *6.

### iii. No reasonable justification

Navarro does not address whether his alleged conduct was reasonably justified. (See generally Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 1-4, ECF No. 34.)  Navarro's declaration is ambiguous.  The officer maintains that "inmates are typically let into their cells as they are processed through the metal detector . . . ."  Yet, he does not state that this was done during the voluntary recall or emergency recall on October 19, 2010. (Defs.' Mot. Summ. J. Attach. #6 Decl. Navarro 2-3, ECF No. 34.) Willis stated that "[he] noticed only Black inmates were being let into their cells by Officer Navarro . . . ." (Resp. 13, ECF No. 38.)  "[T]here were about 50 Hispanic inmates waiting in front of

their cells for the tower officer [Navarro] to let them in, but were all being skipped while Black inmates were secured." (Id.)  A reasonable trier of fact could determine that there was no reasonable justification for celling Black prisoners first, leaving a disproportionate number of Hispanic inmates unsecured.  See Lemire, 726 F.3d at 1080.  Further, a material factual issue exists as to whether Defendant's claimed course of conduct was reasonably justified.  See id. at 1078.  Defendant Navarro's Motion for Summary Judgment as to Willis's Eighth Amendment claim should be **DENIED**.

**B.   Qualified Immunity**

> **1.   Defendants Landeros and Cerros**

Next, Landeros and Cerros raise the affirmative defense of qualified immunity.  (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 20, ECF No. 34.)  These Defendants allege that they are entitled to qualified immunity because there is no case law holding that a correctional officer may be liable for deliberate indifference for failing to secure an equipment locker prior to an "emergency recall" and race riot.  (Id.)  Cerros and Landeros contend that they "could not have known they would be subjected to liability for leaving the equipment cabinet open or responding to a Code 3 alarm."  (Id.)  In his Response, Plaintiff maintains that the Defendants knew that a race riot would likely occur and they "had no reasonable justification for not securing the potential weapons prior to the riot, before the inmates were allowed to enter the building for recall, a safety measure that was supposed to be taken before the building's front security door was opened."  (Resp. 10, ECF No. 38 (citations omitted).)

27

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 566 U.S. \_\_\_\_, 132 S. Ct. 2088, 2093 (2012).  When considering a claim for qualified immunity, courts engage in a two-part inquiry:  Do the facts show that the defendant violated a constitutional right, and was the right clearly established at the time of the defendant's purported misconduct?  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).  A right is clearly established if its contours are so clear that a reasonable official would understand his conduct was unlawful in the situation he confronted.  <u>Dunn v. Castro</u>, 621 F.3d 1196, 1199–1200 (9th Cir. 2010).  This standard ensures that government officials are on notice of the illegality of their conduct before they are subjected to suit.  <u>Hope</u>, 536 U.S. at 739.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ."  <u>Id.</u> (citations omitted).

"[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." <u>Ashcroft v. al-Kidd</u>, 563 U.S. \_\_\_\_, 131 S. Ct. 2074, 2080 (2011) (citing <u>Pearson v. Callahan</u>, 555 U.S. at 236).  "An official is entitled to summary judgment on the ground of qualified immunity where his or her 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>James v. Rowlands</u>, 606 F.3d 646, 650 (9th Cir. 2010) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

Courts should attempt to resolve this threshold immunity question at the earliest possible stage in the litigation "before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" <u>Ashcroft</u>, 563 U.S. \_\_\_\_, 131 S. Ct. at 2080 (quoting <u>Pearson</u>, 555 U.S. at 236-37). "If no constitutional violation is shown, the inquiry ends." <u>Cunningham v. City of Wenatchee</u>, 345 F.3d 802, 810 (9th Cir. 2003) (citations omitted).

Qualified immunity protects an officer who makes a decision that, even if constitutionally deficient, is based on a reasonable misapprehension of the law governing the circumstances he confronted. <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004); <u>see also Saucier v. Katz</u>, 533 U.S. 194, 206 (2001) (quoting <u>Priester v. Riviera Beach</u>, 208 F.3d 919, 926-27 (11th Cir. 2000) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force[ ]' . . ."), <u>abrogated in part on other grounds by</u> <u>Pearson</u>, 555 U.S. at 236). The inquiry is whether the officer knew his conduct was unlawful, and "reasonableness is judged against the backdrop of the law at the time of the conduct." <u>Brosseau</u>, 543 U.S. at 198. If at the time, the law did not clearly establish that the conduct violated the Constitution, the officer should not be subject to liability. <u>Id.</u> "The plaintiff bears the initial burden of proving that the right was clearly established." <u>Sweaney v. Ada Cnty., Idaho</u>, 119 F.3d 1385, 1388 (9th Cir. 1997) (citations omitted).

1            **a.   Violation of a constitutional right**

2        Willis maintains that Defendants Landeros and Cerros violated

3   his Eighth Amendment right to reasonable safety and to be protected

4   from violence while in custody.  See Helling v. McKinney, 509 U.S.

5   at 33.  As discussed, a triable issue of fact exists as to whether

6   these Defendants deprived Plaintiff of his Eighth Amendment rights.

7            **b.   Whether the right was clearly established**

8        "Whether a right is clearly established turns on the

9   'objective legal reasonableness of the action, assessed in light of

10  the legal rules that were clearly established at the time it was

11  taken.'"  Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1241

12  (9th Cir. 2010) (quoting Pearson, 555 U.S. at 244).  "This is 'a

13  two-part inquiry: (1) Was the law governing the state official's

14  conduct clearly established? (2) Under that law could a reasonable

15  state official have believed his conduct was lawful?'"  Estate of

16  Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002)

17  (quoting Jeffers v. Gomez, 267 F.3d at 910); see Browning v.

18  Vernon, 44 F.3d 818, 822 (9th Cir. 1995).

19       First, the law governing the Defendants' conduct was clearly

20  established.  Whether the right is clearly established is a pure

21  question of law.  Act Up!/Portland v. Bagley, 988 F.2d 868, 873

22  (9th Cir. 1993).  "[T]he right alleged to have been violated must

23  not be so broadly defined as to 'convert the rule of qualified that

24  our cases plainly establish into a rule of virtually unqualified

25  liability simply by alleging violation of extremely abstract

26  rights.'"  Cunningham v. Gates, 229 F.3d 1271, 1288 (2000) (quoting

27  Anderson v. Creighton, 483 U.S. 635, 639 (1987)).  "On the other

28  hand, . . . the right can not be so narrowly construed so as to

'define away all potential claims.'"  _Id._ (quoting _Kelley v. Borg_,
60 F.3d 664, 667 (9th Cir. 1995)).

     A prisoner's right to be protected from a substantial risk of
assault by other prisoners was clearly announced in _Farmer_, if not
before.  _See Farmer_, 511 U.S. at 842-43.  There, the Supreme Court
made clear that if a prison official knows of an excessive risk to
inmate safety, or infers from known facts that a substantial risk
of serious harm exists, he violates the law by disregarding the
risk.  _Id._ at 835-37.  The right to protection from violence while
in custody, established by _Farmer_, has been consistently
recognized.  _See Estate of Ford_, 301 F.3d at 1050; _Easter v. CDC_,
No. 09cv0555-LAB (RBB), 2012 WL 760639, at *2 (S.D. Cal. Mar. 8,
2012).  Thus, the right was clearly established.

     Next, the Court must consider whether Landeros and Cerros knew
they were failing to protect Willis from danger by not securing the
equipment locker and podium prior to the voluntary in-lines or at
the time of the emergency recall, or whether the failure to do so
was a reasonable mistake.  _See Easter v. CDC_, 2012 WL 760639, at *3
(citing _Brooks v. Seattle_, 599 F.3d 1018, 1022 (9th Cir. 2010)).
Defendants bear the burden of proving that their actions were made
in the belief that they were lawful.  _Crawford-El v. Britton_, 523
U.S. 574, 586-87 (1998).  Landeros and Cerros do not argue that
they made a reasonable mistake by failing to secure the equipment
locker and podium prior to the voluntary in-lines.  (_See generally_
Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 1-5, ECF No. 34; _id._
Attach. #5 Decl. Cerros at 1-3.)

     The emergency recall occurred at 10:30 a.m.  There is no
showing that between the time of the recall and any increased

31

volume of inmates entering the housing unit, the equipment locker could not be secured.  Neither officer indicates that it would take more than one person a minimal amount of time (possibly seconds) to lock the equipment locker.  Their proximity to the locker is also unstated.  At most, they contend, "Because of the number of inmates entering the housing unit, Officer Cerros and I were not able to lock the equipment locker." (Defs.' Mot. Summ. J. Attach. #4 Decl. Landeros 3, ECF No. 34.)  To show a reasonable belief that their actions were lawful or they were reasonably mistaken, thus entitled to qualified immunity, more specificity is required from each. Furthermore, their focus on the events <u>after</u> the emergency recall is not responsive to Plaintiff's claims.  These Defendants have failed to prove that they are entitled to qualified immunity.

**2.   Defendant Navarro**

Navarro contends that he is entitled to qualified immunity because "[t]here is no case law that holds that admitting inmates into their cells one at a time, as opposed to admitting them in sections, constitutes deliberate indifference." (<u>Id.</u> Attach. #1 Mem. P. & A. at 20.)  He insists that allowing inmates to enter their cells one at a time is quicker and safer than alternative methods.  (<u>Id.</u>)

In the Response, Willis argues that the Defendant focuses on the wrong issue.  (Resp. 11, ECF No. 38.)  He maintains:

> The issue is the Defendant choosing to not secure Hispanic inmates during a voluntary in-line and an emergency recall while allowing the Black inmates into their cells while expecting a mass altercation to occur, creating a serious risk of harm to the remaining Black inmates.  Even without the knowledge of a pending attack, it is common knowledge among correctional officers that a drastic imbalance results in racial tension and/or riots. Defendant Navarro knew proper procedure was to secure inmates as they were ready to enter their cells but still

32

1        skipped Hispanic inmates who were ready to instead secure
       Black inmates leaving a drastic racial imbalance of about
2        4 to 50.

3 (Id. (internal citations omitted).)  Plaintiff asserts that Officer

4 Navarro has not shown reasonable justification for his conduct.

5 (Id.)

6     As discussed, an issue of fact exists as to whether Navarro,

7 the tower officer, deprived Willis of his Eighth Amendment rights.

8 The law governing Defendant's conduct was clearly established; the

9 Court must consider whether a reasonable officer in Defendant

10 Navarro's position could not have believed his conduct was lawful.

11 See Farmer, 511 U.S. at 842-43; Martinez v. Bryant, No. CV

12 06-5344-GW (AGR), 2009 WL 1456399, at *10 (C.D. Cal. May 19, 2009)

13 (citations omitted).

14     Navarro's Declaration is ambiguous and does not expressly

15 refute Willis's version of the facts.  Further, Defendant does not

16 argue that a reasonable officer in his position could have

17 determined it was reasonable to allow Hispanic inmates to

18 congregate outside their cells, creating a racial imbalance.  (See

19 generally Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 20, ECF No.

20 34; id. Attach. #6 Decl. Navarro at 1-4.)  Officer Navarro fails to

21 carry his burden of proving that he is entitled to qualified

22 immunity.

23                 **IV.   CONCLUSION**

24     For the reasons discussed above, the Court recommends that

25 Defendants' Motion for Summary Judgment [ECF No. 34] be **DENIED**.

26 This Report and Recommendation will be submitted to the United

27 States District Court Judge assigned to this case, pursuant to the

28 provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

1  objections with the Court and serve a copy on all parties on or

2  before March 14, 2014.  The document should be captioned

3  "Objections to Report and Recommendation."  Any reply to the

4  objections shall be served and filed on or before April 1, 2014.

5  The parties are advised that failure to file objections within the

6  specified time may waive the right to appeal the district court's

7  order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

8       **IT IS SO ORDERED.**

9

10 DATE: February 20, 2014

   _____
   Ruben B. Brooks, Magistrate Judge
11 United States District Court

12 cc:
   Judge Burns
13 All parties of record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28